## Elouise E. Schwab, Administratrix of Samuel Ginkinger, deceased, v. Allen Ginkinger, Appellant.

[Marked to be reported.]

*Contract—Evidence—Parol evidence.*

Where a contract in writing shows upon its face that it was not the whole contract between the parties, and does not purport to be a complete agreement, parol evidence is admissible to show what was the whole contract and the contract then becomes all parol.

*Contract—Pension money—Legality of contract.*

A contract by a son for the care, protection and maintenance of his father during the remainder of the latter's life, and burial after his death, in consideration of certain pension money which the son had collected for his father; is not illegal.

A gift by a father to a son of pension money which the son had collected for the father is not illegal under the prohibitory provision of the pension law, where there is no agreement for compensation on the part of the son for his services in obtaining the pension, nor proof of any demand or claim of any kind for any compensation whatever.

*Evidence—Competency of witness—Death.*

A son claiming against his father's estate is incompetent to testify to an agreement between himself and father relating to the fund in controversy.

Argued March 10, 1897. Appeal, No. 97, Jan. T., 1897, by defendant, from judgment of C. P. Northampton Co., April T., 1893, No. 18, on verdict for plaintiff. Before STERRETT, C. J., GREEN, MITCHELL and FELL, JJ. Reversed.

Assumpsit to recover a balance of money in the hands of the defendant alleged to belong to the estate of Samuel Ginkinger, deceased. Before SCHUYLER, P. J.

At the trial plaintiff claimed that the defendant who was the son of Samuel Ginkinger, deceased, had collected $1,760.73 pension money for his father, and had retained it for his own use.

The following papers were offered in evidence :

" To all persons whom these presents shall come, Greeting.

" Whereas, Samuel Ginkinger, invalid of the city of Easton, Pa., thus this day make, constitute and appoint my son, Allen Ginkinger, of Easton City, Pa., by virtue of the power and authority given to me by these presents, and I do make and appoint and substitute the said Allen Ginkinger to be my true and lawful attorney to do, execute and perform all such acts, deeds, matters and things as shall and may be requisite and necessary to be done and performed for effecting the purposes and objects in the said Letter of Attorney contained as fully and effectually, in all respects and to all intents and purposes as I myself might or could do, in virtue of the power and authority aforesaid if personally present, hereby ratifying and confirming all and whatsoever my said substitute may lawfully do by virtue hereof.

his

" SAMUEL X GINKINGER.   [SEAL]

mark

" Attest :

  " GEO. H. YOUNG.

  " CONRAD MILLER.

  " A. MENLINE."

" STATE OF PENNSYLVANIA,    }
" COUNTY OF NORTHAMPTON.  } *ss.*

" On the 1st day of April, A. D. 1890, personally appeared before me, an Alderman in and for said county and state, Samuel Ginkinger, and by due course of law acknowledged the foregoing indenture to be your act and desired the same to be recorded according to law.   Witness my hand and seal this 1st day of April, A. D. 1890.

" GEO H. YOUNG, Alderman.   [SEAL] "

" And the said Samuel Ginkinger further agrees that if his son Allen shall provide for him just and right during his nat-

ural life that the balance remaining of his estate shall be for his compensation, etc., in getting said pension, etc.

. his

" SAMUEL ✕ GINKINGER.

mark

" Attest :

" GEO. H. YOUNG.

" CONRAD MILLER.

" A. MENLINE."

The evidence showed that in 1890, the decedent received a check for $750 as a pension from the United States.

Defendant offered to prove by A. Menline that Samuel Ginkinger voluntarily offered to give the balance of the money which he received from this pension check to his son Allen, provided he, Allen, should provide for him during his natural life; that Allen said he did not want it, and the father thereupon said that Allen got the money, that it belonged to him, and that he should have it; it was right that it should go to him, that his other children didn't provide for him.

This was objected to as incompetent and irrelevant, as the terms upon which the money was given to Allen must be found in the written agreement itself.

By the Court: The objection is sustained and bill sealed for defendant. [3]

George H. Young, one of the subscribing witnesses to the agreement was called by plaintiff and testified as follows :

" Q. What did Allen say to him? A. Well, Allen said to him first, ' here is your check for this money for your pension,' and he said ' I don't want it, I want you to have it; ' Al. said, ' here is your check, I have no business with it.' He said ' I want you to have it and take care of it.' Al. said, ' I can't draw the money for you or take care of it unless something is done.' I said he could do it by power of attorney. He said he wanted him to have it, and I went down to the office and drew it, and he said, ' I want you to keep me and provide for me and bury me when I am dead and the balance you are to have,' and the old man gave him a power of attorney to draw the money and then use it and have an agreement to that effect; so I went down to the office and drew it and I went back again ; then I read it over to him and the old man said, ' That is all right, that

is what I want, I want to have it that way,' and he made his mark and those two people witnessed it. Q. Now, at the time when this paper was signed did Allen say in the first place to his father that he didn't want it? A. He said 'I don't want this money, it don't belong to me.' Q. Did the old gentleman give any reason why he wanted Allen to have it? A. He said, ' Through you I got the pension,' and he said the rest never done anything for him, and he said, 'I want you to have it as long as I live, and after I am dead I want you to bury me and the balance you can have.' "

The plaintiff moved to strike out all that portion of George H. Young's testimony which related to any conversation or statements made by Samuel Ginkinger previous to or at the time of the signing of the agreement and power of attorney offered in evidence and relating to his treatment by his children and statements as to by whom he had been cared for.

To which the defendant objected.

By the Court: The objection is overruled and bill sealed for defendant. Let the evidence be stricken out. [4]

Defendant also objected to this action of the court in striking out this testimony.

By the Court: Objection overruled and bill sealed for the defendant. [5]

Defendant's counsel then offered to ask Allen Ginkinger, the defendant, whether he took charge of the application for a pension, whether he received a pension check, and what the agreement was between him and his father with reference to the proceeds from this check.

This was objected to as incompetent and irrelevant; and because the evidence offered is of matters occurring between the decedent and the witness prior to the death of the decedent, and is against the interest of the estate.

By the Court: The objection is sustained and we will give the defendant a bill. [6]

The court gave binding instructions for plaintiff. [1, 2]

Verdict and judgment for plaintiff for $1,883.35. Defendant appealed.

*Errors assigned* were (1, 2) the action of the court in giving binding instructions for plaintiff; (3–6) rulings on evidence, quoting the bill of exceptions.

*Russell C. Stewart*, for appellant.—The law is undoubted that a man may do what he pleases with his personal property. The mere fact that there was not a great deal expended on the father's maintenance does not entitle the children to object in these proceedings: Lines v. Lines, 142 Pa. 149; Pringle v. Pringle, 59 Pa. 281; McLaughlin v. Collins, 138 Pa. 198; Yeakel v. McAtee, 156 Pa. 600.

We think that all we offered to prove by Menline and what Young had testified to was competent testimony: Leggoe v. Mayer, 2 Pa. Superior Ct. 529; Barnhart v. Riddle, 29 Pa. 92; Bown v. Morange, 108 Pa. 69; Irwin v. Patchen, 164 Pa. 52.

The contract was not invalid under the pension laws: United States v. Brown, 40 Fed. Rep. 457; United States v. Hewitt, 11 Fed. Rep. 243; United States v. Moyers, 15 Fed. Rep. 411; United States v. Nicewonger, 20 Fed. Rep. 438; Shuman v. Shuman, 27 Pa. 90; Baker v. Lukens, 35 Pa. 146; Lestapies v. Ingraham, 5 Pa. 71; Fox v. Cash, 11 Pa. 207; Adams v. Grey, 154 Pa. 259; United States v. Irvine, 8 Otto, 450.

No paper-book was filed or argument offered for appellee.

OPINION BY MR. JUSTICE GREEN, April 19, 1897:

This is an action to recover money alleged to be in the hands of the defendant, but belonging to the plaintiff's intestate at the time of his death. It is not an action upon a written instrument of any kind. The testimony to show that the defendant had money in his hands belonging to the plaintiff's intestate was entirely and exclusively in parol. . In order to understand the case at all it was absolutely necessary to hear that testimony, and to have it heard and considered by the jury. When the learned court below excluded the testimony of Menline and struck out the testimony of Young it rejected evidence which was indispensable in determining what money it was, and how much there was of it, and what the circumstances were in which the money was received, which the plaintiff claims belonged to her intestate and was received by the defendant. There was a little testimony left on the record, that of Miller, which was not excluded, probably because its exclusion was not asked, and that testimony throws some light on the subject of contention. But the same considerations which make that

testimony competent and permit it to be adjudged, conclusively require the admission of the rejected testimony, because it is pertinent, material and altogether essential to a just determination of the merits of the controversy.    Without the parol testimony there is but little more than mere chaos in the contention of the parties.    There are but two written papers in the case.    Both were introduced by the defendant.    One of them has no legal meaning whatever, and the other is unintelligible without the help of the parol testimony.    The supposed letter of attorney is evidently a blank form for a substitutionary letter of attorney authorizing another attorney to act in place of the one first appointed.    The blank is inaccurately filled, and the whole only authorizes to be done those things which are specified in an original letter of attorney which never existed, so far as any testimony on this record is concerned.    As it was executed by the principal, and not by the attorney originally constituted, it is impossible to resist the conclusion that there never was any other letter of attorney than such as this paper is.    It contains no authority to do any specific thing.    Nevertheless it did suffice to get the pension check from the official whose business it was to pay it out.

The only other paper in the case is a paper in the following words :—" And the said Samuel Ginkinger further agrees that if his said son Allen shall provide for him just and right during his natural life that the balance remaining of his estate shall be for his compensation, etc., in getting said pension etc.

his<br>
" SAMUEL  ✕  GINKINGER.<br>
mark

" Attest:

  " GEORGE H. YOUNG.

  " CONRAD MILLER.

  " A. MENLINE."

It will be observed at once that this paper does not purport to be a complete agreement, nor to represent all the terms of any agreement.    It says "and the said Samuel Ginkinger further agrees."    What was the precedent part of the agreement to which this paper was the "further" part of the whole agreement?    Where is it to be found?    Not in any preceding written agreement, for there is none.    From the testimony of Young it

appears that this paper was written on the back of the supposed letter of attorney, but as that instrument contained no terms of any agreement, and only purports to authorize the doing of something which is not defined in any manner whatever, it cannot be regarded as being the other and preceding part of the second paper. It is manifest from reading the rejected testimony that it contains the only supplementary matter to which the written paper can possibly refer. In the light of that testimony it is easily understood. Without it the paper is unintelligible. It is evident, therefore, that the whole of the actual contract between the parties, being partly in parol and partly in writing, must all be considered, in order to determine what the contract really was. The principle that a contract which is partly in writing and partly in parol becomes all parol is too familiar to require the citation of authorities. But in this case the application of the written paper to the subject of contention requires the help of the parol testimony. Thus the paper says that the balance of the intestate's " estate," shall belong to the defendant, if he shall provide for his father "just and right during his natural life." Whether this comprehends the pension money only or other estate also requires the help of parol testimony. In any point of view we think it was error to reject the offer of proof by the witness, Menline, and we therefore sustain the third assignment of error. For the same reason we sustain the fourth assignment for the striking out of the testimony of Young.

With this testimony before the jury the question would be, what was the contract between the parties ? If the jury should find that it was a contract for the care, protection and maintenance of the intestate during the remainder of his life, and his burial after his death, and for this purpose the intestate gave to the defendant the money which he received for his pension, there is nothing unlawful in such a contract. The money belonged to the intestate, he could do as he pleased with it, and if it pleased him to give it to the defendant, who was his son, in consideration of his agreement for his support and maintenance during his life, he was perfectly at liberty to do so. There are plenty of such cases in the books. We do not discover the least evidence of imposition, undue influence, or even ordinary solicitation, on the part of the defendant, to induce his

father to make such an arrangement. On the contrary, all the testimony shows that at first the defendant declined to take the money, and it was only when his father insisted upon his taking it and entering into the arrangement for his support and maintenance that he yielded.

Nor do we think that the prohibitory provision of the pension law is applicable to the case as it now appears upon the testimony. There is no evidence whatever of any agreement for compensation on the part of the defendant for his services in obtaining the pension, nor was there any proof of any demand or claim of any kind for any compensation whatever. On the contrary the witness Miller being asked " Q. Tell to the jury what was said at the time by you and by Allen and by Samuel." replied " A. When he handed Mr. Allen Ginkinger the check he said, ' I want you to take this money and keep it.' He said ' I have no more use for it: if you keep me until I die the balance shall be yours.' He says, ' the rest of my children didn't care for me. I cannot go to their house and they can't have none of my money.' Q. What did he say about Allen ? A. He said, ' Allen is the only man that cares for me and looks after my interest; he got my pension, he shall have the money that remains after I am dead.' "

The witness Young said, " Well, Allen Ginkinger handed a check to the old man, his father, and the old man told Al. that he wanted him to take care of it and draw the money, and then Al. said he couldn't do it, and the old man said he wanted him to draw the money, and I was requested to draw up a power of attorney, and he acknowledged it, that Al. should draw the money and take care of it. . . . Q. You say the old gentleman stated in the presence of Al. that he was to take care of it? A. ' Al.' he said, ' here is your check, I have no use for it, you take the money.' He said ' I don't want your money. I want you to take it.' " On being recalled he was asked, " Q. What did Allen say to him ? A. Well, Allen said to him first, ' Here is your check for this money for your pension.' And he said ' I don't want it. I want you to have it.' Al. said, ' Here is your check, I have no business with it. I want you to have it and take care of it.' ' Well,' Al. said, ' I can't draw the money for you, or take care of it, unless something is done.' I said he could do it by a power of attorney. He said he wanted him to

have it and I went down to the office and drew it, and he said,
'I want you to keep me and provide for me, and bury me when
I am dead, and the balance you are to have.' . . . Q. Did the
old gentleman give any reason why he wanted Allen to have
it?   A. He said, 'Through you I got the pension,' and he
said 'the rest never done anything for me,' and he said, 'I want
you to have it as long as I live, and when I am dead I want you
to bury me and the balance you can have.'"

This is practically all of the testimony on this subject, and
we really cannot see anything in it that is violative of the pro-
hibition of the pension law.   Not only was there no agreement,
demand or request by the defendant for any compensation for
his services in getting the pension, but he delivered the check
to his father and declined to take it back or to keep the money
when he was requested to do so by his father.   It was only when
his father repeatedly expressed his strong desire for him to keep
him and provide for him during his life and bury him after
death, that he yielded to his father's wish and agreed to do as
his father requested.   There was nothing said about his having
the money as a compensation for his services in getting the pen-
sion, and it is quite manifest that when the scrivener put into
the written paper the words " in getting said pension," etc., he
did so without any instructions from either the father or son to
that effect.   But even as they are there expressed it is a mere
redundancy, as the preceding part of the paper expressly says
that the balance of the money was to belong to the son as com-
pensation for his providing for his father during his life.   If it
is viewed as a mere gift, and the obtaining of the pension was
the reason of the gift, it would not be in violation of the pension
law.   This was expressly decided in the case of United States
v. Brown, 40 Fed. Rep. 457.   The court said, " If she gave him
the money of her own free will, without any demand on his part,
it not being withheld or retained by him against her wish,
wholly out of gratitude to him for a friendly service, not in-
duced by the fact that a promise or understanding exists by
which he should be compensated for his services ; or by his set-
ting up and insisting upon such a promise or understanding:
or in the absence of it by his claiming some merit or desert on
his part for such service ; in other words, if the money was paid
to him without any demand, request, urgency, or action on his

part, by her, of her own motion, he has not violated the section." Surely this is sound doctrine and good common sense. Unless a person who has received a pension is to be denied the common right of property which is accorded to all other persons of disposing of their own as they see fit, it is not possible to doubt the correctness of the above ruling. It is strictly applicable to the facts of the present case, as we understand them upon the testimony now on record. We think these views control the disposition of the cause. We sustain the first and second assignments. The fifth assignment is not sustained. The relevant matter under the offer must be regarded as having occurred between the dead father and the son, and not between the son and some other living and competent person.

Judgment reversed and new venire awarded.